# EXHIBIT A

# AMENDED AND RESTATED

# GENERAL AGENCY AGREEMENT

## AMIGO PROGRAM

THIS AMENDED AND RESTATED GENERAL AGENCY AGREEMENT (this "Agreement") is made and entered into as of July 15, 2018 (the "Effective Date"), between CLEAR BLUE INSURANCE COMPANY, an insurance company organized under the laws of the State of Illinois (the "Company"), and AMIGO MGA, LLC, an Illinois Limited Liability Company ("General Agent").

## WITNESSETH:

In consideration of the mutual covenants hereinafter contained and upon the terms and conditions set forth in this Agreement, the parties hereto agree as follows:

## PREAMBLE

The parties entered into that certain General Agency Agreement as of July 1, 2016, and the parties desire to amend and restate that Agreement as set forth herein.

This Agreement evidences the mutual intent of the parties that the General Agent will perform all functions necessary for the production, underwriting, service and ongoing management of policies issued by the Company and pursuant to the terms of the Agreement, the Company has also entered into a reinsurance agreement ("Reinsurance Agreement") with reinsurers specified in such Reinsurance Agreement ("Reinsurer") with respect to the risks being underwritten by the General Agent. The contractual assumption by the Reinsurer of the risks detailed in the Reinsurance Agreement is a condition precedent to the Company's entering into this Agreement with the General Agent.

Whereas, Policies administered under this Agreement are hereinafter identified as the Georgia and Arizona non-standard private passenger auto program policies, certificates, endorsements and binders ("Policies") as specified in Schedule 1 attaching hereto (the "Subject Business");

Whereas, the Company and the Reinsurer are entering into a Reinsurance Agreement dated as of July 1, 2016 which Reinsurance Agreement reinsures Policies written under this Agreement;

Whereas, the General Agent desires to perform the functions and duties required of the General Agent as identified in the Reinsurance Agreement and therefore the General Agent hereby agrees to perform those functions, duties, obligations, responsibilities and liabilities identified in the Reinsurance Agreement which are attributable and applicable to the General Agent;

Whereas the General Agent acknowledges that the Company is at risk under, and has ultimate

1



responsibility for, the Policies; therefore, the General Agent agrees that the Company will make the final decision on all matters pertaining to the Policies.

## ARTICLE 1

## APPOINTMENT AND DUTIES

1.1     The Company hereby appoints the General Agent as its general agent for the purpose of producing and underwriting the Subject Business, and issued or renewed on or after the Effective Date of this Agreement. The Company hereby grants authority to the General Agent to solicit, accept and receive applications for such classes of coverage as are specified in Schedule 1; to secure, at its own expense, reasonable underwriting information through reporting agencies or other appropriate sources relating to each risk insured; to issue, renew and countersign Policies which the Company may, from time to time, authorize to be issued, delivered, renewed and countersigned; and to collect and receipt for the premiums thereon and therefor.

1.2     All activities of the General Agent pursuant to this Agreement shall be in strict compliance with (a) all rules, regulations and instructions of the Company, including, but not limited to, all rules, instructions and specifications included in the Company's rate manuals, rate brochures and rate schedules, (b) sound underwriting practices as come within the provisions and limitations of this Agreement, the Underwriting Guidelines relative to the Subject Business as existing from time to time and separately approved by the Company, and any other written instructions provided by the Company, all of which may be amended from time to time, and (c) all of the laws and regulations of the state where the risk is located. A copy of the rate manuals, rate brochures, Underwriting Guidelines and rate schedules, if any, are attached hereto as Exhibit A.

1.3     The General Agent shall promptly take the necessary action to enable the Company to submit any and all regulatory filings necessary to underwrite the Subject Business.

1.4     The Company further authorizes the General Agent to perform certain acts and duties under Policies as would otherwise be performed by the Company and as set forth in this Agreement, including but not limited to, accepting applications from insureds, quoting and binding Policies, sending Policy documents, reports, notices, endorsements and other Policy communications, collecting and remitting monies due from policyholders to the Company, and related activities as set forth in this Agreement. The General Agent shall not have any claim adjustment, handling or settlement authority. However, the General Agent shall notify the Company and the Third Party Administrator (as defined below) promptly if the General Agent is notified that a claim (i) involves a coverage dispute including repudiation of a Policy or denial of a claim; (ii) involves a demand in excess of policy limits; (iii) alleges bad faith; (iv) exceeds $50,000; (v) involves an ex gratia settlement or (vi) alleges a violation of any applicable laws, rules or regulations, provided that the General Agent shall have no affirmative duty to investigate any claim demands.

1.5     The Company will engage and utilize an independent third party claim handling firm (the "Third Party Administrator") and have all claims under Policies adjusted, administered, settled, contested and otherwise handled by such Third Party Administrator including their use of independent

2

claims adjusters, subject to the overall supervision of the Company and its designees, if any. The selection and engagement of the Third Party Administrator shall be subject to prior approval of the Reinsurer and the General Agent, with such approval not to be unreasonably withheld. The Third Party Administrator and any independent claims adjusters working for the Third Party Administrator shall be properly licensed in the jurisdictions where they transact business and will not be agents of the Company or the General Agent. The General Agent shall coordinate, cooperate and communicate in good faith with such Third Party Administrator and its claim adjusters and the Company as necessary to assist with all claim/loss adjustment and reporting matters. Unless otherwise agreed by the Company and the Reinsurer, the Company will confer authority to the Third Party Administrator for claim settlement, dispute resolution or settling of loss reserves up to a maximum of fifty thousand dollars ($50,000), and the Company shall retain final authority for such matters in excess of such amounts. The General Agency shall not have claim handling or claim settlement authority under this Agreement.

1.6    The Company shall not be responsible for the General Agent's expenses and costs, including, but not limited to, salaries, bonuses, rentals, transportation facilities, clerk hire, solicitors' fees, postage, advertising, exchange, personal license fees, adjustment by the General Agent of losses under policies issued by the General Agent, or any other agency expenses whatsoever. The General Agent shall pay all expenses incurred by the General Agent, third parties, and the Company or affiliates of the Company who are acting at the General Agent's request, in preparing forms and rates, and in filing, with the Company's prior written consent, the forms and rates with the appropriate regulatory authorities. The General Agent's sole compensation shall be the amounts payable to the General Agent in Article 6 of this Agreement.

1.7    The General Agent understands and agrees that it has no power or authority granted to it by the Company independent of this Agreement, and that this Agreement and the General Agent's authority hereunder shall cease immediately upon termination, for any reason, of this Agreement (excepting only the General Agent's responsibilities with regard to run -off and other matters as set forth herein). Upon termination of this Agreement, the Company may elect to runoff in-force business and/or claims files itself or through its designee. However, if requested to do so by the Company in writing, the General Agent shall, at its sole expense, run-off and continue to administer to a conclusion, Policies in accordance with the provisions of this Agreement. If the Company assumes control of such Policy files (whether open or closed) as the Company may elect, then the General Agent shall promptly transfer such Policy files to a location specified by the Company.

1.8    The General Agent shall not have the power to accept or bind risks other than as set forth herein, or as may be subsequently authorized by the Company in writing. The General Agent may not bind or cede reinsurance or retrocession on behalf of the Company, may not commit the Company to participation in insurance or reinsurance syndicates, and may not commit the Company to a claim settlement with the Reinsurer without the prior written approval of the Company. If such prior written approval is given, the General Agent shall promptly forward a report to the Company concerning such transaction and/or payment. The Company hereby authorizes the General Agent to collect payments for losses and Loss Adjustment Expenses from the Reinsurer. The General Agent shall send a report to the Company accounting for such transactions promptly.

3

1.9    The General Agent acknowledges that, with respect to any state in which business is permitted to be written, this Agreement shall not become effective until the General Agent is first duly appointed by the Company with the applicable Department of Insurance. The General Agent agrees that any Producer receiving commission pursuant to this Agreement shall first be duly registered by the Company as set forth in Article 7 and such appointment shall also be on file with any applicable state insurance department which requires such appointments.

1.10    Before issuing any Policies, the General Agent shall provide to the Company or its designee for its review and approval the proposed insurance contracts, endorsements, binders, rating plans and rules (collectively "forms and rates"), to be used by the General Agent in administering the Policies. The forms and rates shall comply with applicable statutes, regulations and directives. The General Agent shall forward the forms and rates, together with any associated filings, amendments, and communications with any regulatory authority to the Company. The General Agent acknowledges and agrees that the Company shall have no liability to the General Agent arising out of the failure of any regulatory authority to approve or respond concerning the forms and rates.

1.11    The authority and limitations of the General Agent to issue Policies are as follows:

(a)    The Policy form and related documents to be issued attached hereto as Exhibit A. The General Agent is only authorized to issue Policies in the Policy forms attached as Exhibit A. The Policies will not be amended, altered or modified in any respect (whether by endorsement or otherwise) without the written agreement of the Company.

(b)    The General Agent is authorized to issue Policies (i) in the States and (ii) with maximum limits of liability, deductibles, and premium rates identified in Schedule 1 and Exhibit B. The General Agent is not authorized to issue Policies in any other State without the express written approval of the Company.

(c)    The maximum annual Premium volume shall not exceed the following amounts:

Year 1 - $ 43 Million Gross Premium or the combined Premium volume limits contained in the Reinsurance Agreements entered into by the Company related specifically to the Amigo program. Subsequent years to be agreed upon between the parties.

(d)    The General Agent may increase premium rates subject to rate filing restrictions but shall not decrease premium rates or increase premium discounts without the prior approval of the Company. The Company may increase the premium rates at any time upon written notice to the General Agent

(e)    Except as otherwise set forth herein, the maximum limits of liability for Policies to be produced pursuant to this Agreement shall not exceed the limits as specified in Schedule 1 and Exhibit B. The limits of liability identified in Schedule 1 and Exhibit B shall be in compliance with Company's Reinsurance Agreement and shall not exceed the limitations or restrictions set forth

4

therein.

(f)     The General Agent may issue Policies under this Agreement only in the states in which business is permitted to be underwritten under this Agreement; but this limitation shall not apply to losses if said Policies provide coverage outside the aforesaid territorial limit.

(g)     The General Agent shall only cancel Policies as set forth in the policy form for the Policies produced hereunder or as otherwise permitted by applicable law.

(h)     The maximum term for any Policy issued hereunder shall be 6 months.

(i)     The General Agent shall prepare and maintain a record of the issuance of the Policies, including but not limited to: providing the Company with a monthly premium report as may be required by the Company including but not limited to the premium comparison by Policy on renewal accounts; keeping records of policy numbers issued; and maintaining policy inventories. The General Agent shall prepare and maintain complete, accurate and orderly underwriting books, files, records and accounts of all transactions involving the business transacted pursuant to this Agreement, and will maintain same in accordance with generally accepted insurance and accounting practices or as otherwise reasonably required by the Company or as required by any regulator. The reports to be provided to the Company shall include, but shall not be limited to, information and statistical data (i) required by the Insurance Services Office ("ISO"), (ii) necessary for the Company to prepare any reports required by the National Association of Insurance Commissioners or National Council of Compensation Insurers (including unit statistical reports and data calls relating to any workers' compensation Policies), and (iii) necessary for any other purpose the Company may reasonably require including, without limitation, to enable the Company to monitor and evaluate the business written under this Agreement, and to enable the Company to comply with any current or future state or rating agency reporting requirements.

(j)     The following are underwriting guidelines, exclusions and/or limitations of the General Agent's authority:

- Schedule 1

- Exhibit A

(k)     the excluded risks are those set forth herein.

1. 12   The Parties hereto agree that, if the General Agent receives any claim notices, the General Agent will accept and will not reject, any notice of any claim arising under any of the Policies and tendered to the General Agent, and General Agent shall promptly provide such notice to the Third Party Administrator, unless the Company specifically and in writing directs to the contrary with respect to any individual claim. In the latter event, the General Agent or any permitted designee shall comply with all statutory and/or regulatory requirements and shall follow the written instructions of the Company as respects such claim, provided that the General Agent's duties under this Agreement do not include general claim-adjusting functions. Should the Company be ordered or instructed by

5

any applicable state insurance regulatory authority or any other regulatory agency of competent jurisdiction to take any action or refrain from taking any action with regard to any claim, the General Agent shall be bound by and shall follow the order or instructions of such regulatory agency as though the General Agent were the object of such order or instruction. The General Agent will exercise the authority granted hereunder promptly, properly and in good faith.

## ARTICLE 2

### DEFINITIONS

For purposes of this Agreement:

(a) "Collected Premiums" shall mean the Net Premiums actually received by the General Agent.

(b) "Company Fee" shall equal five point five percent (5.5%) of the Net Premium. Notwithstanding anything else contained herein to the contrary, regardless of the amount of Net Premium, the minimum Company Fee shall be $125,000 for each six-month period during which this Agreement is in effect, such minimum Company Fee shall exclude premium taxes payable to the Company and Bureau Fees.

(c) During the term of this Agreement, the Reinsurer shall be allowed to pay the Company Fee payable to the Company on the basis of Collected Premiums; provided, however, that the General Agent shall remain liable for the full amount of the Company Fee (i.e., based on premiums written) as specified above

(d) "Loss Adjustment Expenses" shall mean those fees paid to attorneys and/or paralegals and other professionals, including Third Party Administrators, and other outside costs related to claim and loss adjustment, but excludes employee and staff counsel expense which are directly involved in the investigation, negotiation, and the settlement of a specific claim, salvage or subrogation.

(e) "Net Premium" shall mean the gross premiums written (excluding policy fees) charged on all original and renewal Policies written on behalf of the Company less return premiums and cancellations.

(f) "Net Policy Fees" shall mean gross policy fees, if any, charged on all original and renewal Policies written on behalf of the Company, less return policy fees.

(g) "Solvent" means on a particular date, the General Agent meets all statutory and regulatory financial requirements in the jurisdiction in which it is domiciled and does not intend to, and does not believe that it will, incur debts or liabilities beyond the General Agent's ability to pay as such debts and liabilities mature.

(h) "Solvency Event" means the General Agent is not Solvent or goes into

6



bankruptcy, liquidation (whether voluntary or compulsory) or has a winding up or receiving or an administration order made against it or a receiver manager or administrator or trustee or custodian is appointed over all or any material part of its properly, undertaking or assets or makes an assignment for the benefit of its creditors, or is required to cease normal operations; and to the extent different, anything analogous to or having a substantially similar effect under the laws of any applicable jurisdiction,

        (i)     "Credit Event" means the failure of the General Agent to discharge its payment obligations under this Agreement when due.

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES OF THE GENERAL AGENT**

     3.1    Solvency: General Agent is Solvent,

     3.2    Organization: General Agent is a company duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its organization, with all necessary corporate power, authority and capacity to own its property and assets and to carry on its business as presently conducted;

     3.3    Due Authorization: General Agent has all necessary corporate power and authority to enter into this Agreement and to carry out its obligations hereunder and the execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder have been duly authorized by all necessary corporate action;

     3.3    Non-Contravention: General Agent is not a party to, bound or affected by or subject to any governing law or constitutional document, indenture, mortgage, lease, material agreement, instrument, charter or bye-law provision, decree or law which would be violated, contravened or breached by, or under which any default would occur as a result of the execution and delivery by it of this Agreement;

     3.4    Statutory Approvals: No declaration, filing or registration with, or notice to or authorization, consent or approval of, any governmental authority is necessary for the execution and delivery of this Agreement by the General Agent;

     3.5    Enforceability of Obligations: This Agreement constitutes valid and binding obligations enforceable against General Agent in accordance with its terms, subject, however, to limitations with respect to enforcement imposed by law in connection with insolvency or similar proceedings and to the extent that equitable remedies such as specific performance and injunction are in the discretion of the court from which they are sought;

     3.6    Litigation: There are no actions, suits or proceedings affecting this Agreement against it at law or in equity or before any governmental authority or any other entity having authority over it that would to any extent impair, restrict, prevent or limit General Agent from fully and timely performing under this Agreement;

7

3.7     General Agent Disputes: There are no material actions, suits or proceedings by or before any arbitrator or governmental authority pending against or, to the knowledge of General Agent, threatened against, concerning or affecting General Agent, that involve or could involve this Agreement or the General Agent's performance hereunder;

3.8     Complete Disclosure:     All information General Agent has provided to the Company, was, to the best of its knowledge, complete, true and accurate as of the dates provided, and to General Agent's knowledge does not contain any untrue statement of material fact or omit to state a material fact necessary to make statements contained therein not misleading. General Agent is not aware of any circumstances, except those to which it has already informed Company, which would reasonably materially alter, modify or affect such information. General Agent acknowledges that the Company has relied on such information and the foregoing representations in entering into this Agreement.

3.9     Financial Capability: General Agent is financially capable, as of the date hereof, of performing its duties as described in this Agreement.

3.10     Regulatory Action: General Agent is not currently subject to any regulatory action, order or proceeding, and its senior management, officers and directors are not aware of any potential or threatened regulatory action or order or other action that prohibits or could prohibit General Agent from performing its duties and obligations under this Agreement.

3.11     Violent Crime Control and Law Enforcement Act of 1994: General Agent is in compliance with the Violent Crime Control and Law Enforcement Act of 1994 and that none of General Agent's officers, directors, employees, agents, subcontractors, or other persons authorized to act on behalf of General Agent has ever been convicted of any state or federal criminal felony involving dishonesty or a breach of trust or any crime under 18 U.S.C. § 1033, unless such individual has obtained the prior written consent of the insurance regulatory official possessing regulatory authority over such individual.

### ARTICLE 4

### COVENANTS OF THE GENERAL AGENT

General Agent covenants and agrees that, from the date hereof and until its obligations under this Agreement have been fully paid and satisfied, unless the Company shall consent otherwise in a writing signed by the Company:

4.1     Legal Compliance: General Agent shall: (i) comply with all licenses, permits, consents or other authorizations held and with any applicable laws, regulations or other legal requirements necessary to conduct business under this Agreement; and (ii) promptly notify Company of any breach of (a) any law, regulation or other legal requirement and/or (b) any revocation, suspension or non-renewal of any license, permit, consent or other authorization held necessary to conduct business under this Agreement, and immediately attempt to remedy such breach.

8



4.2    Renewal of Representations and Warranties: General Agent agrees that the Representations and Warranties set forth in Article 3 will be deemed renewed as of each Anniversary Date, unless within ten (10) days prior to such Anniversary Date General Agent shall disclose to the Company if it can no longer make one or more such Representation and Warranty.

4.3    Authorizations: General Agent will maintain, in full force and effect, all authorizations, approvals, licenses and consents required in or by the laws of the country of its organization to enable it to perform its obligations under this Agreement.

4.4    Notification of Facts Preventing Performance: General Agent will promptly, upon becoming aware of the same, notify the Company of any facts, matters or circumstances which might reasonably prevent General Agent from performing any of its material obligations under this Agreement.

4.5    Rights and Obligations under this Agreement: General Agent will not assign, novate or otherwise transfer the responsibility for the direction of its performance of its obligations under, or the right to enforce its rights under, this Agreement to any other person, firm or company without the Company's prior written consent.

4.6    Financial Statements and Maintaining Solvency: General Agent will not take any action or refrain from taking action the result of which would knowingly result in a Solvency Event or Credit Event.

4.7    Compliance with Company Instructions: The General Agent shall comply with, and shall use commercially reasonable efforts to ensure the compliance by all Producers with the terms of this Agreement and all other written rules and regulations of the Company, treat as confidential and use only in the best interest of the Company all instructions, information and materials received from the Company. General Agent shall not adversely select against the Company in the issuance of any policy where it has the ability to issue such policy in the name of an insurer other than the Company.

## ARTICLE 5

## PREMIUMS

5.1    It is expressly agreed and understood that all premiums collected by the General Agent are collected on behalf of the Company; that such premiums are the property of the Company. All premiums collected by the General Agent on the Subject Business shall be deposited into a premium trust account. The General Agent shall have a fiduciary responsibility to the Company with respect to such premiums and other accounts or funds held on behalf of or due to the Company. Despite the General Agent's ownership of the account, funds deposited therein on behalf of the Company are understood to be owned solely by the Company.

5.2    The only disbursements from such account shall be the payment of return premiums, any amounts due the General Agent as authorized herein, and remitted to the Third Party Administrator at the direction of the Company and its designee, if any, to establish, fund and maintain

9



a separate claims account which the Third Party Administrator will draw against to pay claims and claim related expenses. The commissions payable to the General Agent are debts due to the General Agent by the Company and the privilege herein granted of deducting commissions from said premiums is not a waiver by the Company of its exclusive ownership rights of premiums as provided herein and shall not be construed as an alteration or waiver of the General Agent's fiduciary capacity. Should any dispute arise between the Company and the General Agent regarding payment of premium, the General Agent shall remit immediately all money and property, without offset or deductions for commissions, to the premium trust account with full reservation of any and all rights reserved by the parties.

5.3     The General Agent shall furnish to the Company and, on behalf of the Company, to the Reinsurer, all necessary data (in a form acceptable to the Company, the Reinsurer and/or as required by statutory accounting or by regulation) no later than thirty (30) days following the end of the month during which the business is written to enable the Company to record statistics required by statutes, regulation or upon call by authorities having competent jurisdiction. Such data shall include, but is not limited to, premiums written and unearned premium. Said data shall be segregated by lines of insurance and location of risk. The General Agent shall furnish to the Company a monthly report recapping taxes, assessments, surcharges and Company Fees. The General Agent shall reconcile cash deposited into the premium trust account to premium written on a monthly basis. The reconciliation shall include accounting entries for premium, return premium and commissions.

5.4     The keeping of an account with the General Agent on the Company's books as a creditor and debtor account is declared a record memorandum of business transacted and neither such keeping of an account, nor alteration in commission rate, nor failure to enforce prompt remittance or compromise or settlement or declaration of balance of account, shall be held to waive assertion of the trust or fiduciary relation as to premiums or other funds collected by the General Agent.

5.5     The General Agent shall be liable for the payment of all premiums to the Company upon all policies of insurance written through the General Agent or any Producers. The General Agent shall remit to the Company, as applicable, all premiums due the Company, including any audit premium and/or other retrospective premium, whether collected or not unless otherwise expressly excepted herein, which premiums shall be calculated from the effective date of coverage under the applicable Policies.

5.6     Each monthly payment shall include payment in full for all items reported in the monthly premium account current reported. If the date when any payment is due falls on a Saturday, a Sunday or a bank holiday, then payment shall be due on the last business day prior to such date.

5.7     In the event of nonpayment of any premiums due the Company under the terms of this Agreement, all premiums then due under the terms of any Policies issued by the General Agent subject to this Agreement will become immediately due and payable upon written notice from the Company to the General Agent. If any amounts due from the General Agent are not paid to the Company in accordance with this Agreement and the Company undertakes any action to enforce its rights to such amounts, the General Agent shall pay all costs and expenses, including attorney fees, court costs and

10

amounts due to any collection agency, incurred by the Company related to such action.

5.8     The General Agent shall not offer installment payment options in the name of the Company to any insured, Producer, company, policyholder/certificate holder or other party for the payment of premiums on Subject Business without the express prior written consent of the Company or unless approved in the Underwriting Guidelines.

5.9     If the General Agent has extended credit to any insured, policyholder/certificate holder, Producer or other party for the payment of premiums on Subject Business, such extension of credit shall be at the sole and exclusive risk of the General Agent and the General Agent shall be liable to the Company for any loss the Company may sustain thereby. The Company will have no liability for any commission or other compensation due to any Producer.

5.10    The General Agent agrees to keep the Company advised of any change in the bank where funds are so deposited and to furnish the Company with such information as the Company may require from time to time, including, but not limited to, the amount on deposit in any such account at any time, a list of recent checks drawn on any account containing the names of the payee and the amounts and any other bank information requested by the Company.

5.11    The General Agent shall timely return any unearned premium due insureds or other persons on the Subject Business which is the subject of this Agreement; if for any reason, the General Agent does not return such unearned premium, the General Agent shall be solely responsible for payment of such amounts. If a dispute arises between the General Agent and any third party (including any premium finance company, insured or Producer) regarding the applicability and/or amount of unearned premium to be returned to an insured for any Policy, the General Agent shall immediately notify the Company. The General Agent shall obtain the Company's written approval of the position of the General Agent prior to asserting any position adverse to either the insured or the Company. Should the General Agent fail to comply with the requirements contained in this paragraph, the General Agent shall hold harmless, indemnify and defend the Company from all expenses (including attorney's fees and defense costs) incurred by the Company as a result of such dispute.

5.12    The General Agent will be responsible for collection and payment of all audit premiums and retrospective adjustments.

5.13 In any action or proceeding brought by the Company to recover premiums or return premiums or other funds due the Company under this Agreement or due the insureds under the Policies (collectively "Trust Funds"), the General Agent shall be obligated to account on its own records for such Trust Funds and to pay the Company all sums for which it cannot account. The Company shall be entitled to bring any action or proceeding available at law or equity to recover Trust Funds and to assert claims therein including, without limitation, claims for an accounting, for breach of contract and for conversion. In any such action or proceeding it shall be conclusively presumed that the General Agent is a fiduciary of the Company with respect to Trust Funds and is liable to the Company for Trust Funds which have not been timely paid; and the General Agent waives (a) any right it may have to assert any counterclaim, cross-claim, or set-off in the action or proceeding, (b) the right to trial by jury and (c) any claim that the forum or situs is inconvenient. The General Agent



shall retain the right to bring any separate proceeding it deems appropriate to recover any claims it may have as a creditor of the Company, or otherwise, but the pendency of such proceeding shall not delay, hinder or defeat the Company's right to promptly recover any Trust Funds then due or to levy upon any judgment therefor.

## ARTICLE 6

### COMPENSATION TO THE GENERAL AGENT

6.1 The Company shall allow the General Agent in full and complete compensation for all services rendered and in full reimbursement for all expenditures made by the General Agent a commission determined by multiplying the General Agent's minimum commission rate (currently 17.50 percent) times Collected Premium (the "Commission"). The Commission allowed the General Agent shall be adjusted for each agreement year in accordance with the provisions set forth in the Reinsurance Agreement. The General Agent shall also provide a monthly report to the Company which identifies all Commission retained by the General Agent each month. The General Agent also receives 100% of the Net Policy Fees associated with Policies issued hereunder.

6.2 The Company shall not be liable for or responsible for any commissions or other monies due the General Agent. The General Agent shall retain any Commissions due under this Agreement solely from Collected Premium. In the event the Company, during the continuance of this Agreement or after its termination, refunds premiums under any Policy by reasons of cancellation or otherwise, the General Agent agrees immediately to return to the Company, as applicable, the Commission previously received by the General Agent on the portion of the premium refunded.

## ARTICLE 7

### PRODUCERS

7.1 The Company will, at the request of the General Agent, appoint independent licensed producers ("Producers") to produce business through the General Agent. The Company in their sole discretion may refuse to appoint any such Producer; provided, however, that such appointment shall not be unreasonably withheld. The General Agent will not delegate any authority to any Producer other than authority to produce business eligible for coverage under this Agreement.

7.2 The General Agent shall comply with, and shall be responsible to insure the compliance by all Producers with, the terms of this Agreement and all other written rules and regulations of the Company, and treat as confidential and use only in the best interest of the Company all instructions, information and materials received from the Company.

7.3 The General Agent shall be solely responsible for the control of any Producers under all of the terms and provisions hereof, including, but not limited to, compliance with state licensing laws, the financial condition of the Producers, the collections of premiums, and refunds of premiums.

7.4 Each Producer must be registered or appointed, as required, as a Producer of the Company through the appropriate regulatory body before any application shall be accepted or other



insurance performances are conducted by the Producer on behalf of the Company. The General Agent shall be ultimately responsible for the obligations of the Producer.

7.5     The General Agent shall be solely responsible for all commissions or fees payable to any Producer. The General Agent and any Producer shall not seek to hold the Company liable or responsible through litigation, arbitration or otherwise for commissions or fees payable to such Producers.

7.6     The Company, in its sole discretion with or without cause, and without prior written notice, may terminate the appointment of any Producer.

7.7     The General Agent shall not permit its Producers to serve on its Board of Directors.

7.8     The General Agent shall not employ or compensate in any manner an individual who is employed with the Company.

7.9     The General Agent shall be responsible for the payment of any penalty assessed to the Company for any violation by the General Agent or any Producer of any license or appointment provision of any state insurance code or other applicable state statutes, and the rules and regulations promulgated thereunder.

## ARTICLE 8

## ADDITIONAL DUTIES OF GENERAL AGENT

8.1     The General Agent shall, at all times during the period of this Agreement, comply with all applicable laws and all orders, policy decisions or other requirements of the Illinois Department of Insurance or other applicable state insurance department.

8.2     All books, records, accounts, documents and correspondence of the General Agent and any Producer pertaining to the Company's business shall, at all times, be open to examination by any authorized representative or regulator of the Company. The General Agent shall make copies of records, at the expense of the person requesting the copies, available upon request by the Company, whether such request is before or after termination of this Agreement.  Such records must be maintained for five (5) years, until the completion of a financial examination by the insurance department of the state in which the Company is domiciled or seven (7) years following the settlement of all claims, whichever is longer. The General Agent shall not alter, modify, amend or delete any such records without first providing prior notice to the Company.

8.3     The Company's representatives, at their expense, shall have the right (but not the obligation) from time to time, during normal business hours, on reasonable notice to the General Agent, to inspect, audit, copy and make extracts from the General Agent's books, tiles, records date and accounts relating to business transacted pursuant to this Agreement and in compliance with any and all information privacy laws and regulations. The foregoing right shall survive termination of this Agreement.

13

8.4     The General Agent shall maintain adequate accounting procedures and systems, at no cost or expense to the Company, and shall provide statistics in a timely manner for all reporting requirements under this Agreement or as shall be required from time to time by the regulatory authorities of the State of Illinois or any other applicable governmental agency or authority. Such statistical information shall be the joint property of the Company and the General Agent and shall be provided to the Company by the General Agent at the General Agent's sole cost and expense.

8.5     The General Agent shall forward the Company, no later than the 15th day of the month following the month being accounted for, a report in detail of all policies of insurance written or placed, or liability increased or decreased, or policies continued or renewed or canceled by or through the General Agent during the month being accounted for, which shall include all premiums due thereon whether collected or not. Such report shall show the net amount due to the Company on all such business on the lines of business authorized to be written by the General Agent and the amounts paid in commissions. Such report shall also include, to the extent not already included, both insurance and reinsurance transactions, including:

        (i)     statement of Net Premium, Collected Premium, and Ceded Premium which are written, earned and unearned;

        (ii)    a Policy Premium Report which includes the information identified on Exhibit C; and

The reports shall be received by or confirmed to the Company no later than fifteen (15) days from the close of the month for which business is reported. The Company shall maintain such account reports on file for at least five (5) years or seven (7) years following the settlement of all claims, whichever is longer and shall make the account reports available to the Commissioner of Insurance of the State of Illinois (the "Commissioner"), or other applicable state department of insurance, for review upon request,

8.6     The General Agent shall account for and furnish to the Company on behalf of the Company at the Reinsurer's expense, and upon request with reasonable notice, complete copies of all Policies issued, copies of all spoiled, voided or otherwise unissued policies, and require the Third Party Administrator to provide copies of all claim files created with respect to all loss occurrences under any Policy issued under this Agreement,

8.7     The Company is the sole owner of all undelivered policies, books, supplies, or other property related to the reinsured business is in the Company, and these shall be delivered to the Company by the General Agent immediately upon the termination of this Agreement.

8.8     The General Agent shall not insert any advertisement respecting the Company in any publication or issue any circular or paper referring to the Company without first obtaining the written consent of the Company. The General Agent shall comply with all statutes and regulations pertaining to advertising, and establish and maintain records of any such advertising as required by the applicable laws of the states in which it is doing business.

14

8.9     The General Agent shall maintain on behalf of the Company complete copies of all Policies issued hereunder and copies of any other files created with respect to all loss occurrences thereunder. Any or all Policies and/or other files required to be maintained by General Agent pursuant to this Article 8 may be maintained in electronic data storage form accessible by computer and, if so stored in this fashion, no physical copy of such items need be maintained. Where electronic files are maintained by the General Agent, any data from such files requested or required by the Reinsurer on behalf of the Company shall be provided within thirty (30) days or less if so requested by the Reinsurer on behalf of the Company. The General Agent shall also maintain a separate backup copy of the data required herein at an offsite location.

8.10     The General Agent shall be solely responsible for procuring any renewal, extension, or new policy of insurance that may be required by any state or rule or regulation of any state insurance department with respect to policies originally written directly for the Company. The General Agent shall indemnify the Company and hold it harmless from any loss, damage, cost, claim or expense whatsoever that the Company may incur, or for which it may become liable, as a result of the said General Agent's failure, refusal or neglect to fulfill said responsibility.

8.11     The General Agent agrees that its duties and obligations under this Agreement shall be due and owing to the Company and its successors and assigns.

8.12     The Company will conduct or cause to be conducted an examination of the General Agent, in accordance with the Company's audit guidelines. Furthermore, if the Company's aggregate premium volume increases by thirty (30) percent in any thirty (30) day period, the Company may in its discretion examine or cause to be examined within ninety (90) days the General Agent if it writes more than twenty (20) percent of the Company's volume and has also experienced a twenty (20) percent increase in premium volume during that same thirty (30) day period. The General Agent shall pay the expenses incurred for an examination under this paragraph, subject to a maximum payment often thousand ($10,000) dollars.

The examinations referenced under the preceding paragraph shall adequately provide the Company with the information outlined in (a) through (e) below, shall be made available to the Company for review, shall remain on file with the Company for a minimum of three (3) years and shall, at a minimum, contain information concerning the following:

> (i)     timeliness of premium reporting and collection by the General Agent;
>
> (ii)     compliance by the General Agent with the Underwriting Guidelines; and
>
> (iii)     reconciliation of policy inventory.

8.13     The General Agent shall be duly licensed as a general agent or as otherwise required under applicable law to perform its duties hereunder.

15

8.14    Should any state insurance department make a request to the Company for any data required to comply with a statistical data call, the General Agent shall provide the Company with such data related to the business produced hereunder. Should the request from such state insurance department require the Company to contract the services of an outside source, such as an actuarial firm, to compile the data required, the General Agent shall be responsible for its proportionate share of the total cost for services rendered.

8.15    The General Agent, when placing business under this Agreement, shall retain any Net Policy Fees charged. The General Agent shall be responsible for and shall submit to the Company in the monthly bordereau any taxes or tax liability that the Company incurs on Net Policy Fees by any applicable regulatory or taxing authority.

8.16    The General Agent shall provide the Company, at the General Agent's expense, with an independent financial examination in a form acceptable to the applicable state departments of insurance, or other regulatory body, if required.

8.17    The General Agent acknowledges receipt of and shall comply with the Company's statistical reporting policy and procedure manual. The General Agent will act on behalf of the Company to produce, prepare, and file statistical information with the designated statistical reporting bureau. The General Agent will also furnish the Company, and other parties as designated by the Company, with monthly, quarterly and annual reports showing statistical data in respect of the business written as required.

8.18    The Company will provide to the General Agent the percentage of Net Premium to remit directly to Company on a monthly basis for bureau fees related to statistical reporting, and boards and bureaus participation ("Bureau Fees"). In addition to the Bureau Fees, should the Company be charged any fines or penalties for incomplete, inaccurate, or delinquent reporting, the General Agent shall pay such fines or penalties immediately upon written notice. The General Agent will remit Bureau Fees as designated by the Company until notified of any necessary adjustments to the amount of the Bureau Fees. The initial Bureau Fees shall be 0.40% of Net Premium. The Bureau Fees are in addition to other fees and expenses expressly enumerated herein.

8.19    All records pertaining to claims arising under Policies, to the extent the General Agent maintains any such files, shall be deemed to be jointly owned records of the Company and the General Agent, and shall be made available to the Company or the General Agent or their respective representatives or any duly appointed insurance examiner for any state within the United States; and these records shall be kept in Illinois or such other jurisdiction as may be required by applicable state law or regulation. Notwithstanding the foregoing, the Company is authorized to maintain duplicate working files of all such records outside the North Carolina. The Company and the General Agent each agree that it will not destroy any such records in its possession without the prior written approval of the other parties except that the Company shall not be required to retain files longer than required by the laws or guidelines set forth by any applicable state department of insurance.

8.20    The General Agent will furnish to the Company within thirty (30) days after the close

16

of each of the respective periods indicated below (on forms agreeable to the parties), with monthly, quarterly and annual reports showing the following statistical data in respect to the Policies issued hereunder:

      (a)   Monthly, with the data segregated by major classes.

          (i)   Net Premium

          (ii)   Unearned premiums.

          (iii)   Collected Premiums.

          (iv)   Unearned Collected Premiums.

          (v)   Net Policy Fees

          (vi)   Premium and excise taxes.

      (b)   Annually, with the data segregated by major classes.

          (i)   Annual summaries of Net Premium, net losses paid, net adjusting expenses paid during the year in such form so as to enable the Company to record such data in their annual convention statement. Such information is to be furnished not later than January 15th of the following year. In force and unearned premium segregated as to advance premiums, premiums running twelve (12) months or less from inception date of policy, and premiums running more than twelve (12) months from inception date of policy in such form as to enable the Company to record such data in its convention annual statement.

          (ii)   Annual summaries of Net Premium written by geographical location in such form as to enable the Company to record such premiums in its annual report to the Illinois Catastrophe Property Insurance Association.

      (c)   Periodic, with data segregated by major lines.

          (i)   Statistical or other data as may be requested from time to time by regulatory authorities.

    8.21   In order to facilitate the handling of the Subject Business, the General Agent agrees to furnish the Company with any additional reports necessary to provide the information needed by the Company to prepare its monthly, quarterly and annual statements to regulatory authorities.

    8.22   Within thirty (30) days after the end of each month, the General Agent shall pay the Company the (i) Company Fee plus (ii) premium taxes due for Net Premiums and Policy Fees.

17

8.23   The General Agent shall pay all federal excise taxes payable for premium ceded to any reinsurer that is not otherwise exempt from such tax.

8.24   The General Agent shall pay the Reinsurer Net Premium less the sum of (i) Commissions (ii) Company Fee (iii) premium taxes payable to the Company (v) and Bureau Fees.

8.25   The General Agent shall provide the Reinsurer internet access to all Policy files throughout the term of this Agreement until the run-off of all Subject Business has been completed.

8.26   The General Agent shall acquire and maintain an errors and omissions insurance policy issued by an insurance carrier admitted to transact business in the state of Illinois subject to the approval of the Company, with policy limits equal to five Million Dollars ($5,000,000), and a deductible no greater than $50,000. Proof satisfactory to the Company of the issuance and maintenance of such errors and omissions policy shall be submitted annually to the Company no later than April 30th of each year. The General Agent shall maintain its errors and omissions insurance policy for no less than two (2) years following the termination of this Agreement. Any such policy shall provide the General Agent for coverage tor both its activities as a General Agent and in its capacity for adjusting and handling all losses hereunder.

8.27   With respect to Policies covered by this Agreement, if any premiums are financed, the General Agent shall receive and accept on behalf of the Company all notices required by statute, contract or otherwise to be given to the Company, including, without limitation, notices of the existence of premium finance agreements or of cancellation of Policies the premiums of which are financed ("Financed Policies"). No Producer shall be entitled to receive or accept any notice on behalf of the Company, and the General Agent shall be responsible for and will indemnify and hold the Company harmless from and against any and all liabilities, losses, claims, damages and expenses incurred by reason of or arising out of any action taken or inaction suffered as a result of receipt of any notice by any person, firm or entity other than the General Agent or the Company. Notwithstanding any other term or provision of this Agreement, the General Agent agrees to return and pay over to any premium finance company (whether affiliated with the Company or not) which has sent notice of cancellation of a financed Policy to the Genera! Agent, on behalf of the Company, within thirty (30) days of receipt of such notice of cancellation, any and all unearned commissions as of the date of cancellation, together with any and all unearned premiums due any premium finance company. The General Agent agrees to and does hereby relinquish any and all rights to any unearned commissions for any such financed Policy as of the date of cancellation. The obligation of the General Agent to refund unearned commissions and unearned premiums on a canceled Financed Policy shall survive the termination or cancellation of this Agreement for so long as any Policy written under the terms of this Agreement remains in force. If the General Agent does not fulfill its obligations to refund unearned commissions and unearned premiums as provided in this Article 8 and/or to indemnify the Company as provided in this Article 8, then the Reinsurer shall pay the amount of the refund owed and/or shall indemnify the Company even if the premium finance company is an affiliate of the Company.

8.28   The General Agent is required to place a minimum of fifty (50) Policies per year with

18

the Company or produce an amount of Policies/business with the Company to produce no less than at least $50,000 per year in gross written premium annually under this Agreement.

## ARTICLE 9

## TERM AND TERMINATION

9.1     This Agreement may be terminated as follows:

(a)     By the Company by providing at least ninety (90) days prior written notice to the General Agent;

(b)     By the Company or the General Agent upon ten (10) days prior written notice if: the Company ceases underwriting operations; a State insurance Department or other legal authority orders the Company to cease writing business; the Company has become insolvent or has been placed under supervision (voluntarily or involuntarily), into liquidation or receivership, or there has been instituted against it proceedings for the appointment of a supervisor, receiver, liquidator, rehabilitator, conservator or trustee in bankruptcy, or other agent known by whatever name, to take possession of its assets or control of its operations; the Company's policyholders' surplus has been reduced by whichever is greater, (a) 20% of the amount of surplus at the inception of this Agreement or (b) 20% of the amount stated in its last annual statement; the Company has or has attempted to transfer its entire liability under this Agreement without the other party's prior written consent; or the Company's AM Best rating is at any time less than A;

(c)     Immediately upon notice by the Company in the event of the cancellation or non-renewal of the General Agent's license by the Illinois Department of Insurance;

(d)     By the Company after thirty (30) days written notice to the General Agent of the General Agent's failure to pay all payments of premiums due hereunder, provided, however, that in the event such payment is received prior to the date of termination stated in notice this Agreement shall not be so terminated under this subsection (d) and said written notice shall be of no further force or effect. If the Company receives such late premium within a ten (10) day period following receipt of such notice, the termination of the Agreement for reason of default pursuant to this subsection (d) shall be rescinded;

(e)     At the election of the Company, upon notice to the General Agent, if the General Agent commits any of the following acts or omissions: fraud, gross negligence or willful misconduct (which includes, but is not limited to, willful violation of the Company's instructions, willful violation of any covenant in this Agreement on its part to be performed, or willful violation of any insurance department regulation or statutory provision applicable to the General Agent);

(f)     At the election of the Company, if the General Agent breaches any provision of this Agreement (other than breaches or violations by the General Agent covered elsewhere in this Section 9.01) and fails to cure such breach within ten (10) days after notice of the breach is given to the General Agent by the Company; for purposes of this subdivision (f), routine differences in the

19

accounting methods of the General Agent and the Company which involve minor amounts of money, and do not involve premiums collected and knowingly withheld by the General Agent, shall not constitute failure to account for and pay over premiums provided all items not in dispute are paid in accordance with the collection and remittance procedures set forth in this Agreement;

(g)     Immediately, upon notice by the Company, if the General Agent is found to be insolvent by a State Insurance Department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation, or liquidation, or has a receiver or supervisor appointed;

(h)     By the Company immediately and automatically without prior notice should the Illinois Department of Insurance or other regulatory agency of competent jurisdiction, require cancellation or disallow credit for any reinsurance for the business written hereunder;

(i)     After thirty (30) days' notice by the Company in the event that the General Agent changes a majority of its officers, shareholders or board of directors during the term of this Agreement or no longer employs Alan Rasof in his capacity as President of Amigo;

(j)     If the General Agent shall defraud or attempt to defraud the Company; or any policyholder, then the Company may at its sole discretion cancel this contract by giving the General Agent written notice of cancellation served personally or by mail, which shall be effective immediately;

(k)     Automatically and immediately, without prior notice upon termination of the Reinsurance Agreement;

(l)     Immediately at the election of the Company, if in the Company's sole discretion (i) the Loss Ratio (as defined below) is greater than 95%, or (ii) the premium rates are unlikely to avoid an underwriting loss by the Reinsurer being received are insufficient for the business being written;

(m)     At the election of the Company, in the event of a material adverse change in the Company's obligations under the Policies;

(n)     At the election of the Company, in the event that the General Agent fails to meet its reporting obligations under this Agreement;

9.2     This Agreement shall automatically become renewed from year to year upon the renewal of the license or certificate of authority granted to the Company by the Illinois Department of Insurance, provided this Agreement shall not be otherwise terminated.

9.3     It is expressly agreed and understood that nothing in this Article 9 authorizes the General Agent to write any new business under this Agreement should the Reinsurance Agreement terminate, except the business that is required to be renewed or issued because of applicable law or regulation.

20

9.4     The Company shall have no liability to the General Agent by virtue of the Company's termination of this Agreement as set forth in this Article; it being expressly understood that partial consideration for the Company's grant of agency authority to the General Agent is the General Agent's promise that the Company shall not be responsible for any damages which might arise by virtue of any termination of this Agreement. Neither the General Agent, nor any Producer, or any of their employees or representatives, shall have or assert any claim against the Company, their subsidiaries, successors, or assigns, or the shareholders, directors, officers, agents or employees of any of them, for Joss of business, loss of profits, or damage to goodwill or reputation, as a result of the termination of this Agreement.

9.5     In the event of termination of this Agreement, after the General Agent having promptly accounted for and paid over premiums for which it may be liable, the General Agent's records, use and control of expirations shall remain the property of the General Agent and left in its undisputed possession.

9.6     In the event that this Agreement is terminated, the General Agent, for no additional fee, shall be required (unless revoked by the Company at its sole discretion in which case the Company shall appoint a successor) as provided in this Agreement to continue to perform all of its duties under this Agreement on the remaining policies during the run-off period. The General Agent's duties during the run-off period shall include, but shall not be limited to handling and servicing of all policies through their natural expiration, together with any policy renewals required to be made by the provisions of applicable law, whether or not the effective date of such renewal is subsequent to the effective date of cancellation of this Agreement. All costs and expenses associated with the handling of such run-off business following the cancellation or termination of this Agreement shall be borne solely by the General Agent.

9.7     If for any reason the General Agent fails or is unable to service any such run-off business (or any business while the Agreement is still in effect), then consistent with this Agreement, the Company shall appoint a successor to the General Agent (after consultation with the Reinsurer), to administer and otherwise handle the run-off as provided herein. Such successor shall perform all of the duties and obligations of the General Agent with respect to servicing such run-off business. In addition, the Company in its sole discretion may terminate the authority of the General Agent or a successor thereto to handle such run-off business and then appoint a successor to handle the run-off, subject to the Reinsurer's approval (whose approval shall not be unreasonably withheld), at no cost to the Company. Further, upon termination of this Agreement, the General Agent shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, or accounting, which relate to the outstanding insurance business under this Agreement existing on the date of such termination. The Company and the General Agent will cooperate in handling all such business until the business has expired either by cancellation or by the terms of the policies and all outstanding losses and Loss Adjustment Expenses have been settled.

9.8     The General Agent will fully cooperate with the Company (or its designated representative) in providing access to such of the General Agent's personnel, computer systems or other assets or procedures as the Company may deem necessary to provide for an orderly transition

21

of the administration of the Policies administered under this Agreement.

9.9     Upon termination of this Agreement, the General Agent shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, accounting, or handling, which relate to insurance business insured under this Agreement.

9.10    Upon termination of this Agreement, the General Agent shall service the runoff off of the business, and its duties for such run-off shall include, but not be limited to handling and servicing all policies through their natural expiration, together with any policy renewals, required to be made by provisions of applicable law, whether or not the effective date of such renewal is subsequent to the effective date of cancellation of this Agreement. All costs and expenses associated with the handling of such run off business following the cancellation or termination of this Agreement shall be borne solely by the General Agent.

9.11    The Company may suspend the authority of the General Agent during the pendency of any dispute regarding any material breach of this Agreement by the General Agent.

9.12    The General Agent agrees that, notwithstanding anything to the contrary, its appointment by the Company to produce business and appoint Producers terminates when this Agreement terminates unless the General Agent's authority has been terminated earlier; except that the Company shall provide the General Agent with the limited agency authority needed to service the run-off of the business, e.g., issue, cancel, offer renewal of policies where required by law.

9.13    Upon termination of this Agreement, the General Agent shall service the run-off of the business, and its duties for such run-off shall include, but not be limited to handling and servicing all policies through their natural expiration, together with any policy renewals, required to be made by provisions of applicable law, whether or not the effective date of such renewal is subsequent to the effective date of cancellation of this Agreement. All costs and expenses associated with the handling of such run-off business following the cancellation or termination of this Agreement shall be borne solely by the General Agent. If for any reason the General Agent fails or is unable to service any such run-off business (or any business while the Agreement is still in effect), then consistent with this Agreement, the Company shall appoint a successor to the General Agent (after consultation with the Reinsurer), to administer and otherwise handle the run-off as provided herein. Such successor shall perform all of the duties and obligations of the General Agent with respect to servicing such run-off business. In addition, the Company in its sole discretion may terminate the authority of the General Agent or a successor thereto to handle such run-off business and then appoint a successor to handle the run-off, subject to the Reinsurer's approval, at no cost to the Company.

9.14    The title and ownership of all undelivered Policies, books, supplies or other property related to the reinsured business is in the name of the Company, and upon termination of this Agreement these shall be delivered immediately by General Agent to the Company, without compelling the Company to resort to any legal proceedings to secure this described property of the Company. Provided, however, that the parties acknowledge that the General Agent is authorized to create and maintain duplicate working files of all such records at any time.

22

9.15   The General Agent shall not assert any lien or other interest in such property. Upon request of the Company, prior to or after the termination of this Agreement, the General Agent shall provide to the Company, at the General Agent's sole cost and expense, electronic copies of any and all data related to the insured business in a format specified by the Company. Further, the General Agent shall ensure any vendor or other third party acknowledges and agrees the Company, at no expense to the Company, shall have use of any systems, data, information, reports, files or statistics prior to or after the termination of this Agreement.

9.16   Upon termination of this Agreement, the General Agent shall take those actions necessary, including, but not limited to, sending statutorily prescribed non-renewal notices to insureds in a timely manner to effectuate the intent that there be no renewals or new policies (but for those required by applicable law or regulation) after the termination of this Agreement.

## ARTICLE 10

## HOLD HARMLESS AND INDEMNIFICATION

10.1   The General Agent agrees to and does hereby indemnify, pay on behalf of and hold the Company, its subsidiaries, successors and assigns, and the shareholders, directors, officers, agents and employees of any of them (the "indemnities"), harmless, including paying for all costs of defense without limitation, from and against any and all actions, causes of actions, suits, arbitrations, or proceedings of any kind, liabilities, losses, claims, demands, damages, judgments, costs, or expenses (including attorneys' fees and expenses), and any loss in excess of policy limits, as well as extra-contractual obligations, including but not limited to punitive, exemplary, or compensatory damages, suffered made or instituted against or incurred by the indemnitees, or any of them, by reason of, arising out of, or relating in any way to this Agreement or any action taken or inaction by the General Agent in breach of the terms of this Agreement, or which is not in full compliance therewith.

10.2   The General Agent further agrees that it shall pay and be responsible for the payment of any penalty assessed to the Company for any violation by the General Agent or any producing agent or broker registered by the General Agent pursuant to the provisions of Article 7 hereof of any license or appointment provision of the Georgia or Arizona Insurance Codes or other applicable state statutes, and the rules and regulations promulgated thereunder.

10.3   The General Agent shall indemnify the Company and hold it harmless from any loss, damage, cost, claim or expense whatsoever that the Company may incur, or for which it may become liable, as a result of the said General Agent's failure, refusal or neglect to renew, extend, or issue a new policy of insurance that may be required by any state or rule or regulation of any state insurance department with respect to policies originally written directly for or on behalf of the Company.

10.4   In the event the General Agent, or any agent appointed pursuant to this Agreement, binds the Company for insurance coverage on insurance risks which are in excess of the policy limits authorized under this Agreement, and/or are not within the terms of business specified under this Agreement, and/or are not within the states authorized under this Agreement, and/or are excluded under this Agreement, whether intentional or not, the General Agent shall do such things and take

23

such actions as may be necessary to reduce the Company's exposure to such risks and indemnify, pay on behalf of or hold the Company harmless against any liability or loss which may be incurred by the Company in excess thereof.

10.5    The Company's tosses, fees and/or expenses incurred in connection with any action or other proceeding brought under to enforce any provision of this Agreement by which the General Agent agrees to hold the Company harmless and provide indemnity, shall also be indemnified by the General Agent.

## ARTICLE 11

### MISCELLANEOUS

11.1    This Agreement shall be interpreted and construed under the laws of North Carolina, excluding any conflict of law or choice of law rules which might lead to the application of the internal laws of another jurisdiction.

11.2    This Agreement shall be binding upon the parties hereto, together with their respective successors. No Party may assign any of its rights or obligations under this Agreement.

11.3    The Company shall not have a right of control over the General Agent as to time, means or manner of the General Agent's conduct within the terms of the Agreement and the authority herein granted, and nothing herein is intended or shall be deemed to constitute the General Agent an employee, partner or servant of the Company. The General Agent shall at all times be an independent contractor.

11.4    This Agreement shall be deemed performable at the Company's administrative office in Charlotte, North Carolina, and it is agreed that the venue of any controversy arising out of this Agreement, or for the breach thereof, shall be in Mecklenburg County, North Carolina.

11.5    The General Agent shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Company. No verbal modification will be recognized by any party hereto and this Agreement cannot be modified by any subsequent practices or course of dealing by the parties inconsistent herewith. If the Company or the General Agent shall fail to take advantage of a breach, if any, by another party of the terms, conditions, covenants, or any of them herein contained, such failure shall not be deemed to constitute, or be construed as, a waiver of any rights on the part of the General Agent or Company to thereafter enforce any of the said terms, conditions or covenants.

11.6    Integration and Waiver: This Agreement (and any amendments thereto) contains the entire agreement between the Parties with respect to the transactions contemplated hereby and supersedes all prior negotiations, representations, warranties, commitments, offers, contracts, slips, cover notes, undertakings, understandings, and contracts, whether written or oral, between the Parties with respect to the subject matter hereof. The Parties also acknowledge that the Company and the Reinsurer have entered into a Reinsurance Agreement related to the Subject Business. No amendment, waiver or supplement by either Party of any provision of this Agreement will be effective unless made

24



in writing and signed by an authorized officer of the Company and General Agent and shall be effective only as to the specifically stated amendment, waiver or supplement. All such amendments, waivers or supplements shall specific the effective date of such amendment, waiver or supplement. No waiver shall constitute a continuous waiver or waiver of future performance or obligation unless specifically provided tor in the written waiver by the waiving Party. Notwithstanding the foregoing, the Underwriting Guidelines may be amended at any time by the Company.

11.7    The General Agent shall notify the Company in writing at least thirty (30) days prior to any of the following occurrences, each of which shall be deemed a "change of control" a sale, transfer or pledge, or the issuance to a new shareholder or member, of ten percent (10%) or more of the voting stock or membership interests of the General Agent; or a sale, transfer or pledge of a substantial portion of the material assets of the General Agent, or any merger or consolidation of the General Agent with another entity or entities; or a change in any director or principal officer of the General Agent; or an assignment or transfer of this Agreement or any rights hereunder by the General Agent.

11.8    The General Agent shall not offset balances due under this Agreement against balances due or owing under any other contract. The General Agent's right to offset any balance under this Agreement is solely limited to the right to offset Commissions from Collected Premium, and this offset right shall be suspended during the pendency of any action against the General Agent under or related to this Agreement,

11.9    If it is found or ordered by a court or regulatory body that any non-material provision or term of this Agreement does not conform to such law or regulation then this Agreement shall be deemed to be amended, and modified to be in accordance with such law. However, where this Agreement is found not to comply with applicable law or regulations, the Company may in its sole discretion terminate this Agreement immediately and without prior notice.

11.10   The Company may grant or delegate to the Reinsurer certain rights under the Reinsurance Agreement, including the rights of a third party beneficiary and assignee of the Company's rights under this Agreement. The General Agent acknowledges and agrees that (i) the Company may grant or delegate to the Reinsurer such third party beneficiary and assignee rights and (ii) the Reinsurer may be a third party beneficiary to all promises, duties and obligations made by the General Agent to the Company under the General Agency Agreement to the extent of all damages, fines, penalties and /or losses (including attorney fees) incurred by the Reinsurer. Except as otherwise set forth in this paragraph, nothing in this Agreement is intended or shall be construed to give any person, other than the Parties hereto, their successors and permitted assigns, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision herein. Nothing contained in this Agreement or in any other document or instrument made in connection with this Agreement shall be deemed or construed to create a Partnership or joint venture. No Party shall in any way be responsible for the debts, losses, expenses, obligations or duties of any other Party, except as expressly set forth in this Agreement.

11.11   The Company and the General Agent hereby acknowledge and agree that (i) each

25

party and its counsel have reviewed and have had an opportunity to negotiate the terms and provisions of this Agreement and have contributed or have been offered the opportunity to contribute to their revision; (ii) the normal rule of construction, to the effect that any ambiguities are resolved against the drafting party, shall not be employed in the interpretation of them; and (iii) the terms and provisions of this Agreement shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

11.12  At the Company's request, the General Agent in accordance with applicable law, and policy terms, shall cancel or not renew any risk bound which is not in conformance with this Agreement.

11.13  When a claim is asserted or action commenced, including class actions regardless of whether the class has been certified, relating in any way to the Policies produced under this Agreement, the General Agent shall assume the defense and associated costs and expenses thereof. The Company may elect, however, at its sole discretion, on a case-by-case basis, to engage counsel directly on its own behalf, and the expenses and costs related to such defense shall be passed on to and paid by the General Agent within 60 days written notice from the Company. The General Agent shall remit any amounts due to the Company under this Section 11.13 within sixty (60) days after written notice from the Company.

11.14  Each Party hereto agrees that all financial settlements, billings, and reports rendered to the other Party, as provided for in this agreement and/or any amendments to it, will to the best of its knowledge and belief, reflect properly the facts about all activities and transactions related to this agreement, which data may be relied upon as being complete and accurate in any further recording and reporting made by such other Party for whatever purposes.

11.15  The General Agent shall not sue, or seek arbitration against, the Company for any defaults by, or acts or omissions of the Reinsurer. The Company is not responsible for any commissions or other monies payable to the General Agent in connection with this Agreement, and the General Agent shall not sue, or seek arbitration against, the Company for any claims concerning, or debts owing from, the Reinsurer.

11.16  All terms, provisions, references and conditions in the GAA that impose any type of limit, condition or restriction on the premium amount, premium volume, Policy limits, liability limits, caps, Policy exclusions, reinsurance exclusions, deductibles, retentions, premium rates, Policy Fees, new business production and any similar factors ("*Terms*"), to the extent such Terms are also set forth in the Reinsurance Agreements (as defined below), shall be inoperative in the GAA and replaced with such Terms as set forth in the several reinsurance agreements entered into by the Company and such reinsurers from time to time (the "*Reinsurance Agreements*"). The Terms shall be so changed ("*Modifications*"), at any time and from time to time, immediately and automatically when any or all of the Reinsurance Agreements change or are replaced by new Reinsurance Agreements. Such Modifications to the GAA (a) shall be automatic and not require further action by the

26



Company or the General Agent, and (b) shall be set at the Terms that are the most restrictive of such Terms as set forth in any of the Reinsurance Agreements. Such affected provisions of the GAA include without limitation Section 1.2, Section 1.11, Schedule 1, Exhibit A and the Underwriting Guidelines. This Section 11.16 is effective and operative as of May 1, 2017.

## ARTICLE 12

## ARBITRATION

12.1  <u>Resolution of Damages</u>. Any dispute between any Party arising out of the provisions of this Agreement or its termination, or concerning its interpretation or validity, whether arising before or after termination of this Agreement, shall be submitted to arbitration in the manner set forth in this Article. Each party may initiate arbitration of any such dispute by giving written notice to other parties by registered mail postage prepaid return receipt requested or a recognized overnight courier of its intention to arbitrate and of its appointment of an arbitrator (each a "Notice of Intention to Arbitrate").

12.2  <u>Composition of Panel</u>. Unless the parties agree upon a single arbitrator within fifteen (15) days after the receipt of a Notice of Intention to Arbitrate, all disputes shall be submitted to an arbitration panel composed of two arbitrators and an umpire, chosen in accordance with Section 12.3.

12.3  <u>Appointment of Arbitrators</u>. The party requesting arbitration (hereinafter referred to as the "Claimant") shall appoint an arbitrator and give written notice thereof, by registered mail or a recognized overnight courier to the other party (hereinafter referred to as the "Respondent") together with its Notice of Intention to Arbitrate. The Notice of Intent to Arbitrate shall identify the issue(s) for which arbitration is sought. Unless a single arbitrator is agreed upon within fifteen (15) days after the receipt of the Notice of Intention to Arbitrate, the respondent shall, within thirty (30) days after receiving such notice, also appoint an arbitrator and notify the Claimant thereof in a like manner. Before instituting a hearing, the two arbitrators so appointed shall choose an impartial umpire. If, within thirty (30) days after they are both appointed, the arbitrators fail to agree upon the appointment of an umpire, the umpire shall be appointed by the Chairman of the International Association for Insurance Law ("AIOA") and the Reinsurance and Insurance Arbitration Society ("ARIAS-US"). The umpire shall be an arbitrator certified by ARIAS-U.S. The arbitrators shall be present or former executives or officers of insurance or reinsurance companies with experience in the reinsurance of property and casualty insurance policies or arbitrators certified by ARIAS-US. The arbitrators and umpire shall be disinterested individuals and not be under the control of either party, and shall have no financial interest in the outcome of the arbitration other than fees that they be entitled to in their arbitration capacity.

12.4  <u>Consolidation</u>. In the event of a dispute between the Parties concerning this Agreement, the Managing General Agency Agreement, the Representation and Warranties Agreement, or any other agreement ancillary thereto, the entire dispute shall be subject to arbitration as provided in this Article and may be consolidated at the sole election of the Company with any other

27

arbitration between the Company and any other Party whether arising under or related to this Agreement, the Managing General Agency Agreement, the Representation and Warranties Agreement or any other agreement ancillary thereto. In such instance, the Company will constitute one "party" and all others will constitute the other" party" for purposes of selection of arbitrator and umpire.

12.5   Failure of a Party to Appoint Arbitrator. If a Respondent fails to appoint an arbitrator within thirty (30) days after receiving a Notice of Intention to Arbitrate, such arbitrator shall be appointed by the Chairman of ARIAS-US, and shall then, together with the arbitrator appointed by the claimant, choose an umpire as provided in Section C.

12.6   Choice of Forum. Any arbitration initiated pursuant to this Article shall be conducted in accordance with the ARIAS-U.S. Rules for the Resolution of U.S. Insurance and Reinsurance Disputes ("the Rules"), unless otherwise agreed by the Parties or a conflict exists between the Rules and this Article. In that circumstance, the provisions of this Article shall prevail over the Rules. Any arbitration initiated pursuant to this Article shall be held in New York, New York, U.S.A., unless otherwise agreed by the Parties.

12.7   Submission of Dispute to Panel. Unless otherwise extended by the arbitration panel, days after the selection of an umpire. The respondent shall submit its brief within forty-five (45) days thereafter. The claimant may submit a reply brief within thirty (30) days after the filing of the respondent's brief. Notwithstanding anything herein to the contrary, the time period for submission of the case to the panel may be extended or modified by mutual consent of the parties or by order of the panel.

12.8   Procedure Governing Arbitration. All proceedings before the panel shall be informal and the panel shall not be bound by the formal rules of evidence. The panel shall have the power to fix all procedural rules relating to the arbitration proceeding. In reaching any decision, the panel shall give due consideration to the custom and usage of the insurance and reinsurance business, with a view to effecting the general purpose of this Agreement.

12.9   Arbitration Award. The arbitration panel shall render its decision within sixty (60) days after termination of the proceeding unless the parties consent to an extension, which decision shall be in writing, stating the reasons therefor. The transactions contemplated by this Agreement involve interstate commerce and the parties agree that the Federal Arbitration Act shall apply. The decision of the majority of the panel shall be final, non-appealable, and binding on the parties to the proceeding except to the extent otherwise provided in the Federal Arbitration Act. Judgment upon the award may be entered in any court having jurisdiction pursuant to the Federal Arbitration Act.

12.10   Cost of Arbitration. Each party shall bear the expense of the arbitrator it appoints, its own witnesses and its attorneys' fees and shall equally bear with the other parties the expense of the umpire and the administrative expenses associated with the arbitration.

12.11   Limit of Authority. It is agreed that the arbitrators shall have no authority to authorize any punitive, exemplary or consequential damage awards between the parties hereto,

28

12.12 <u>Rights Not Limited</u>. Any Party may, without waiving any right or remedy under this Agreement seek any interim, preliminary or injunctive relief that is necessary to protect the rights or property of that Party, pending an arbitration award by the arbitrators. The Parties agree that the exclusive venue and jurisdiction for any court action or other legal proceeding seeking such relief will be in the state or federal district courts located in North Carolina, and the Parties hereby waive any defenses or objections to such venue or jurisdiction that might otherwise be available.

12.13 <u>Confidentiality</u>. Except as may be required by law or required to secure a judgment on the arbitration award, neither the Parties nor the arbitrators shall disclose the existence, content or results of any arbitration conducted hereunder without the prior written consent of the Parties.

12.14 <u>Survival</u>. This Article [12] shall survive the termination of this Agreement.

## ARTICLE 13

## PRIVACY

13.1 The General Agent shall provide to each new policyholder, prior to or upon the issuance of any Policies written under this Agreement, and in accordance with applicable state and federal laws, an initial notice of the Company's privacy policies and practices. Not less than annually thereafter, the General Agent, upon the request of the Company, distributes a copy of the Company's annual privacy notice, as may be amended from time to time, to each existing policyholder. In addition, the General Agent shall, upon the request of the Company, distribute revised privacy notices and opt-out notices as applicable to each policyholder to reflect any revisions which may be made to the Company's privacy policies and practices. In each case, the Company shall be responsible for providing the Agency with a copy of the form for its privacy policies and practices notice, which forms the General Agent shall use to create and deliver the notices described herein, at the Agency's sole cost and expense. These notices shall be created and delivered independent of any separate legal obligation the General Agent may have to create and deliver its own such notices.

13.2 The General Agent shall not disclose or use any nonpublic personal financial information or nonpublic personal health information related to any policyholder, or to any consumer or customer (as such terms are defined under applicable state and federal privacy laws), except as necessary to carry out its duties and obligations under this Agreement or as otherwise permitted under applicable state or federal law.

13.3 The General Agent shall develop and implement, in accordance with applicable state and federal laws, a comprehensive written information security program designed to (i) ensure the security and confidentiality of nonpublic personal financial information and nonpublic personal health information related to any policyholder, or to any consumer or customer (as such terms are defined under applicable state and federal privacy laws), (ii) protect against any anticipated threats or hazards to the security or integrity of such information, and (iii) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer.

[Signatures on following page]

29

IN WITNESS WHEREOF, the Parties hereto by their respective duly authorized representatives have executed this Agreement as of the date first above written.

CLEAR BLUE INSURANCE COMPANY

By: _____
Name: Daniel O. Kennedy
Title: SVP & General Counsel

AMIGO MGA LLC

By: _____
Name: ALAN + RASF
Title: President

30

## SCHEDULE 1

## SUBJECT BUSINESS

Georgia, Arizona and Texas non-standard private passenger auto insurance Policies issued on behalf of the Company by the General Agent.

The maximum limits for Policies to be issued by the General Agent are:

<u>Georgia</u>
Maximum 6-month policy term

| | |
|---|---|
| Automobile Liability: | Bodily Injury $25,000 per person / $50,000 per accident; Property Damage $27,500 |
| Medical Expenses: | $5,000 |
| Uninsured Motorists: | Bodily Injury $25,000 per person/$50,000 per accident Property Damage $27,500 |
| Comprehensive/Collision: | $40,000 any one vehicle |

<u>Arizona</u>

Maximum 6-month policy term

| | |
|---|---|
| Automobile Liability: | Bodily Injury $15,000 per person / $30,000 per accident; Property Damage $10,000. |
| Medical Expenses: | $5,000 |
| Uninsured/Underinsured Motorists: | Bodily Injury $15,000 per person / $30,000 per accident; Property Damage $10,000. |
| Comprehensive/Collision: | $40,000 any one vehicle. |

<u>Texas</u>
Maximum 6-month policy term

| | |
|---|---|
| Automobile Liability: | Bodily Injury $30,000 per person / $60,000 per accident; Property Damage $25,000. |
| Medical Expenses: | $500 |
| Uninsured/Underinsured Motorists: | Bodily Injury $30,000 per person / $60,000 per accident; Property Damage $25,000. |

Comprehensive/Collision Deductible: $500

PIP - $2500

31

**EXHIBIT A**

**UNDERWRITING GUIDELINES, POLICY SAMPLE AND RELATED DOCUMENTS**

32

**Exhibit B**
**Policy Report**

The General Agent shall forward to the Company and to the Reinsurer, no later than the 15th day of the month following the month being accounted for, a Monthly Report as detailed below. The following details of each individual policy written must be provided in a Microsoft Excel spreadsheet:

EXHIBIT C
Rating and Limit Matrix

34

**EXHIBIT D**

**Loss Report**

**Loss Reporting:**

1.     4. Claim Number

2.     Customer Name

3.     Policy Number

4.     Dealer ID

5.     Policy Inception Date of Cancellation

6.     Policy Term